# Exhibit 4

598 Fed.Appx. 227
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Mable CALEB; Patrick Cockerham; Diann Banks; Herbert Lenton, Plaintiffs–Appellants

v.

Doctor Terry GRIER; Houston Independent School District, also known as HISD; Elizabeth Mata Kroger; David Frizell; Esteban Majlat, Defendants–Appellees.

No. 13–20582.
|
Jan. 6, 2015.

**Synopsis**
**Background:** Employees commenced action against school district, superintendent, lawyer hired for internal investigation, and private investigators, alleging freedom of speech, retaliation, freedom of association, and procedural due process claims. The United States District Court for the Southern District of Texas, Ewing Werlein, Jr., J., 2013 WL 2902785, dismissed the claims against the lawyer and investigators, and granted motion in part for certification and entry of final judgment, 2013 WL 5614310. Employees appealed.

**Holdings:** The Court of Appeals held that:

[1] lawyer and investigators were not state actors;

[2] speech by teacher's assistant, teacher, and school custodian was outside ambit of First Amendment protection on retaliation claim;

[3] teacher's assistant, teacher, and school custodian did not suggest intimate relationship protected by First Amendment;

[4] mere reference by lawyer that public school principal whose employment was terminated had relationships with state representative and school board member did not plausibly suggest that lawyer, or investigators, took any action against principal based on that association;

[5] teacher's assistant, teacher, and school custodian did not state that they had been denied procedural due process; and

[6] lawyer and private investigators did not violate procedural due process rights of principal.

Affirmed.

West Headnotes (6)

[1]  **Constitutional Law** ← Applicability to governmental or private action; state action
     **Education** ← Principals

Lawyer hired by superintendent for internal investigation, and private investigators hired by lawyer, were not state actors, as to allegations by public school principal that lawyer and investigators violated her First Amendment rights by recommending that school district terminate her employment after she allegedly had engaged in protected speech, since lawyer and investigators did not have any power to discipline school district employees, school district could have rejected recommendation, and school district did actual firing. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[2]  **Constitutional Law** ← Public or private concern; speaking as "citizen"
     **Education** ← Grounds for removal or other adverse action
     **Education** ← Protected activities in general
     **Public Employment** ← Protected activities
     **Public Employment** ← Protected activities

Speech by teacher's assistant, teacher, and school custodian during interviews as part of internal investigation concerning allegations of cheating

on state standardized tests and misappropriation of school property was made as employees, and not as citizens, and therefore was outside ambit of First Amendment protection on retaliation claim, since speech was made within chain of command and it was related to their jobs; assisting in public employer's investigation into workplace theft ordinarily was within scope of employee's job duties, and ensuring compliance with standardized testing procedures ordinarily was within scope of teacher's duties. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[3] **Constitutional Law** ← Education in general
**Education** ← Grounds for removal or other adverse action
**Education** ← Protected activities in general
**Public Employment** ← Protected activities
**Public Employment** ← Protected activities

Teacher's assistant, teacher, and school custodian whose employment was terminated did not suggest intimate relationship protected by First Amendment, as required for freedom of association claim, by alleging that they "exercised protected association with [public school principal who was terminated], in that they constituted members of what [investigator had] characterized as [principal's] clique," since "association" was nothing more than group of close work colleagues. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[4] **Constitutional Law** ← Administrators
**Education** ← Principals

Mere reference by lawyer hired by superintendent for internal investigation that public school principal whose employment was terminated had relationships with state representative and school board member did not plausibly suggest that lawyer, or private investigators hired by lawyer for internal investigation, took any action against principal based on that association, as required to state claim against lawyer and investigators based on her First Amendment right of political association. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[5] **Constitutional Law** ← Notice and hearing; proceedings and review
**Education** ← Proceedings and review
**Education** ← Right to hearing
**Public Employment** ← Necessity of hearing; requests
**Public Employment** ← Pleading

Teacher's assistant, teacher, and school custodian whose employment was terminated did not state that they had been denied procedural due process, where they did not allege that they requested and were denied hearing prior to termination of their employment. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[6] **Civil Rights** ← Education
**Education** ← Proceedings and review
**Public Employment** ← Procedural Requirements and Protections in General

Lawyer hired by superintendent for internal investigation, and private investigators hired by lawyer for internal investigation, did not violate procedural due process rights of public school principal whose employment was terminated, since lawyer and investigators did not have any ability or authority to deny principal access to name-clearing hearing, or influence denial of hearing. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**Attorneys and Law Firms**

*228 Laurence Wade Watts, Watts & Associates, Missouri City, TX, for Plaintiffs–Appellants.

Arturo Garcia Michel, John M. Hopkins, Esq., Kevin Frank Risley, Thompson & Horton, L.L.P., Houston, TX, Richard Alan Morris, Adam David Courtin, Rogers, Morris & Grover, L.L.P., Houston, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas. No. 4:12–CV–675.

Before KING, DENNIS, and CLEMENT, Circuit Judges.

**Opinion**

PER CURIAM:[*]

Plaintiffs–Appellants appeal the district court's dismissal of their complaint for failure *229 to state a claim on which relief can be granted. Appellants sued under 42 U.S.C. § 1983 for violations of their rights to freedom of speech, freedom of association, and procedural due process. For the reasons that follow, we AFFIRM.

**I. Factual and Procedural Background**[1]

This case arises out of the Houston Independent School District's ("HISD") investigation of Appellants' activities while employed by HISD. Plaintiff–Appellant Mable Caleb was formerly the principal of Key Middle School ("Key") and later of Kashmere High School ("Kashmere"). Key and Kashmere are both schools within HISD. Plaintiff–Appellant Diann Banks was a sixth grade math teacher at Key. Plaintiff–Appellant Herbert Lenton was an "operator" at Key, meaning he was responsible for cleaning and maintenance duties. Plaintiff–Appellant Patrick Cockerham was a teacher's assistant at Key, starting at the beginning of the 2008–2009 school year.

In 1993, Caleb was appointed principal of Key, a school serving an "at risk" student population. In 2005, Richard Adebayo, Key's math department chairman/coordinator, was accused of facilitating student cheating on the Texas Assessment of Knowledge and Skills ("TAKS") standardized test. Caleb alleges that she exercised protected speech when she refused to agree with purportedly false accusations that Adebayo was involved with TAKS cheating at Key.

In 2007, students and staff alleged that they were made ill by toxic mold within Key, though HISD apparently denied that there was a mold problem. Caleb voiced agreement with the students' and staff's concerns to the media. Subsequently, the Centers for Disease Control and the Environmental Protection Agency found mold at Key. HISD ordered that Key be reconditioned in order to address the problem. Key was reopened under Caleb's leadership for the 2008–2009 school year.

In January 2009, in order to help teachers prepare their students for the math portion of the 2008–2009 TAKS test, preparation materials were distributed by Key's math department. During the preparation period, Banks was given a handwritten set of math problems and was told that they were being delivered on behalf of the math department and that she needed to type the handwritten material. Rather than type the material, Banks re-wrote the set of math problems in neater handwriting. Later, Soo Jin Lee, another teacher at Key, typed Banks's handwritten version, and then distributed them as a practice set to the rest of Key's math teachers. Appellants allege that those math problems were actual TAKS questions, and that Lee and another teacher had planned to introduce those questions into Key students' preparation materials in order to artificially inflate the students' scores, thus qualifying the teachers for a bonus. Appellants allege that Banks was an unwilling participant in this scheme.

In April 2009, Caleb was notified that she would be transferred to serve as principal at Kashmere for the 2009–2010 school year; she was told to accept the transfer, or she would be forced into early retirement. After accepting, Caleb served as transitional principal of Key, until a new principal was appointed. On Caleb's recommendation, *230 Bernett Harris took over as principal of Key.

After Terry Grier was hired, in September 2009, as the new superintendent of HISD, he decided to remove Harris as principal. Members of the community, including the pastor of New Mt. Calvary Baptist Church, Willie Jones, were concerned about Grier's decision, as they believed that Harris was the right person for the principal's job at Key. Reverend Jones asked Grier not to remove Harris until Grier had met with the community's leaders; Grier agreed. However, he allegedly went back on his promise and replaced Harris before any such meeting was held. On November 12, 2009, a town hall meeting was held at New Mt. Calvary Baptist Church to discuss Grier's decision to remove Harris as principal of Key. At 5:00 p.m., Grier called Caleb "to ask if she would be present at the meeting and, if so, to apologize for his absence." Caleb attended the meeting, apologized for Grier's absence, and applauded the audience's

"display of personal responsibility and parental involvement [by] attending the meeting and showing concern for their children's education." On November 13, 2009, Reverend Jones and Texas State Representative Harold Dutton picketed the HISD administration building in support of Harris. On November 14, 2009, Grier attended a second meeting at the church, where he was questioned and criticized by the audience.

Appellants allege that shortly thereafter Grier resolved to terminate Caleb. He allegedly decided to lay a basis for Caleb's termination by conducting an investigation into an anonymous allegation that Caleb, Lenton, and others had stolen HISD property from Key when they moved Caleb's belongings from Key to Kashmere on October 31, 2009.

After her transfer to Kashmere, Caleb had asked Cockerham and Lenton to transfer to Kashmere with her. During the summer of 2009, Cockerham was assigned to organize Kashmere's book room. After completing that task, Cockerham was asked to return to Key to document information on computers in the AV room, including a computer assigned to Caleb. Later, Cockerham's involvement with those tasks prompted HISD's investigators to question him about whether school equipment, including the computers, was removed from Key.

On October 31, 2009, Harris and Caleb decided to transfer Caleb's collection of personal items from Key, along with "items needed to start up the new Kashmere administration." Caleb and Harris also decided to "move and 4 relocate any HISD assets which should be at Kashmere from Key, in accordance with HISD practices." They allegedly scheduled the move with an HISD administrator, Tony Shelvin. Later that day, Harris, Caleb, Lenton, and other Key employees moved Caleb's personal property and HISD property from Key to Kashmere.

Appellants allege that Grier used the movement of HISD property from Key to Kashmere as the basis for hiring Defendant–Appellee Elizabeth Mata Kroger, a partner of the private law firm Martin, Disiere, Jefferson & Wisdom, L.L.P. ("MDJW"). Kroger then hired Defendants–Appellees David Frizell and Esteban Majlat to assist with the investigation. MDJW's involvement began with a preliminary inquiry to determine whether a more thorough investigation was necessary.

On December 4, 2009, Cockerham was instructed by Caleb to help Majlat and others locate and check the serial numbers of computers. On December 7, 2009, Majlat met with Cockerham for two hours. During the meeting, Majlat asked whether *231 Cockerham had moved anything for Caleb, or if Caleb had stolen district property or taken district property home with her. Cockerham answered that he did not know. According to the complaint, "[t]he meeting terminated with Cockerham stating that he had never taken any property for Caleb or witnessed her take any property from the school." On December 10, 2009, Cockerham received a letter instructing him to meet with Kroger, Frizell and others. At the meeting, Kroger explained that Cockerham was not the target of the investigation, but he may have relevant information. Cockerham left after he stated that he wouldn't answer any more questions without an attorney present.

On December 11, 2009, MDJW recommended that HISD hire them to conduct an investigation of the "purchase, inventory and use of fixed assets, including technology equipment, intended for Key Middle School, as well as 5 the transfer and removal of such assets to Kashmere High School." The scope of the investigation expanded to include, in addition to the allegations of misappropriation of school property: "overtime work and benefits to relatives of Mabel Caleb ... [and] possible improprieties concerning TAKS testing at Key during [the] 2008–2009 academic school year."

Over the next several months, all of the Appellants were questioned by Kroger, Frizell, and Majlat as part of the internal investigation. On December 17, 2009, Cockerham met with Kroger, Frizell, Majlat, and others for a second round of questioning. Allegedly, Kroger and Frizell called Cockerham a liar and said that they could not understand why he would protect Caleb. On December 18, 2009, Caleb attended a three hour meeting with Kroger, Frizell and Majlat.

On January 15, 2010, Cockerham was reassigned to the HISD Transportation Department. Cockerham alleged that he was transferred because he refused to corroborate the false accusations against Caleb. HISD also attempted to terminate Cockerham's employment. After a hearing, an Independent Hearing Officer found for Cockerham and refused to terminate him. Grier allegedly refused to reinstate Cockerham or allow him to be rehired for the following school year. Consequently, Cockerham was unemployed until 2011, when Grier allowed him to be reemployed by HISD.

On January 20, 2010, Banks was told to appear at HISD's Administration Building, where Kroger interviewed her. On February 25, 2010, Banks was told to schedule another meeting with Kroger. At that meeting, she was questioned regarding the allegations of cheating on the TAKS exam. It is alleged that Majlat and the others "suggest[ed] that Adebayo had caused cheating," and that Majlat and the others "coax[ed] Banks to confirm [Adebayo's] participation." On April 8, 2010, Grier notified HISD's board that he recommended Banks be terminated for insubordination, violating district policies, falsifying records, and other offenses. On July 22, 2010, a hearing was conducted by an Independent Hearing Officer regarding Banks's termination. At the conclusion of the hearing, the hearing officer completely exonerated Banks. But because Banks was "deeply disturbed and distrustful of Defendants herein," she "believed [that] she was forced to resign from HISD in order to save her career."

Lenton was interviewed by Frizell on December 7, 2009. Frizell explained that the purpose of the interview was to determine what happened when the property was moved on October 31, 2009. On December 15, 2009, Lenton met with Frizell, Majlat, and others for a second time. During this meeting, Lenton was asked by *232 Majlat if Caleb had taken anything from Key. At this meeting, Majlat and Frizell allegedly called Lenton a liar and accused him of using drugs and alcohol. Lenton stated that he was not going to lie about Caleb to save his job. In October 2010, Lenton alleges that he was terminated, after an independent hearing, for refusing to make false statements about Caleb's involvement in the alleged misappropriation of school district property.

On March 2, 2012, Appellants filed their original complaint. On August 29, 2012, the plaintiffs filed their "Corrected Third Amended Original Complaint," the operative complaint for purposes of this appeal, alleging First Amendment retaliation claims, due process claims, and an equal protection claim. Appellees filed motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

On October 1, 2013, the district court dismissed all of the claims made by Banks, Lenton, and Cockerham.[2] Furthermore, the district court dismissed all of Caleb's claims against Kroger, Frizell, and Majlat, and her equal protection claim against Grier. However, the court did not dismiss all of Caleb's claims against HISD and Grier. On September 5, 2013, Appellees filed a joint motion for certification and entry of final judgment pursuant to Federal Rule of Civil Procedure Rule 54(b). On October 14, 2013, the district court granted in part and denied in part the Appellees' motion. The district court entered final judgment as to all of the claims made by Banks, Lenton, and Cockerham. Furthermore, the district court entered final judgment as to all claims made by Caleb against Kroger, Frizell, and Majlat. However, the district court did not enter final judgment as to the claims made by Caleb against HISD and Grier, noting that "Caleb's remaining claims against Grier and HISD in this case at least tangentially relate to ... much of the same set of facts as the dismissed claims." Accordingly, Caleb's claims made against HISD and Grier are not a part of this appeal.[3]

## II. Standard of Review

"This court reviews a district court's dismissal under Rule 12(b)(6) *de novo,* accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities,* 540 F.3d 333, 338 (5th Cir.2008) (internal quotation marks omitted). In order to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Although a complaint "does not need detailed factual allegations ... [the] allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal citations omitted). Furthermore, "dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995) (internal quotation *233 marks, citation, and brackets omitted). Finally, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Beavers v. Metro. Life Ins. Co.,* 566 F.3d 436, 439 (5th Cir.2009) (internal quotation marks and citation omitted).

## III. Freedom of Speech Claims

Appellants have failed to plead sufficient facts to state a First Amendment free speech retaliation claim. In order to sufficiently plead such a claim, Appellants must have alleged facts that show: (1) they "suffered an adverse employment decision; (2) [their] speech involved a matter of public concern; (3) [their] interest in commenting on matters of public concern ... outweigh[s] the [Appellees'] interest in promoting efficiency; and (4) [their] speech motivated the adverse employment decision." *Beattie v. Madison Cnty. Sch. Dist.,* 254 F.3d 595, 601 (5th Cir.2001) (internal citations and quotation marks omitted). In other words, a plaintiff must plead facts to show that he "engaged in protected conduct and that it was a motivating factor in [his] discharge." *Id.* Further, a plaintiff who is a public employee must show that he spoke as a citizen, not as an employee pursuant to his official duties. That is because while "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), not all speech by public employees is protected by the First Amendment. For "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951; *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 693 (5th Cir.2007) ( "These cases, when viewed as a whole, distinguish between speech that is 'the kind of activity engaged in by citizens who do not work for the government,' and activities undertaken in the course of performing one's job. Activities undertaken in the course of performing one's job are activities pursuant to official duties." (internal citation omitted) (quoting *Garcetti,* 547 U.S. at 423, 126 S.Ct. 1951)). However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks,* 573 U.S. ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). Accordingly, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* We first address Caleb's First Amendment claims separately from those of Cockerham, Banks, and Lenton.

**[1]** Caleb has failed to state a claim under section 1983 for First Amendment retaliation. We begin by noting that only Caleb's claims against Kroger, Frizell, and Majlat are before us as part of this appeal; the district court has not entered final judgment as to Caleb's claims against HISD and Grier. Generally speaking, in order to state a claim under section 1983, the plaintiff must show that the defendant's challenged conduct constituted "state action." *Rundus v. City of Dallas,* 634 F.3d 309, 312 (5th Cir.2011); *see Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The state action requirement preserves the "essential dichotomy" set forth in the Fourteenth Amendment between a deprivation of rights by the state, "subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' **\*234** against which the Fourteenth Amendment offers no shield." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). While the Supreme Court has pronounced several legal tests for determining whether challenged conduct is state action, the core inquiry asks whether the deprivation of a federal right is fairly attributable to the State. *See Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295–96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The Supreme Court has described a two-part approach to resolving that issue: first, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or a person for whom the State is responsible;" second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

"In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *NCAA v. Tarkanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Yet this is not the typical case. Here, Caleb alleges that Kroger, Frizell, and Majlat violated her First Amendment rights merely by recommending her termination by HISD based on protected speech; it was HISD that did the actual firing. We hold that these allegations are insufficient to hold Kroger, Frizell, and Majlat liable as state actors.

In *NCAA v. Tarkanian,* the Supreme Court confronted a similar situation. The NCAA, a private association, investigated the recruiting practices of Tarkanian, the basketball coach at the University of Nevada Las Vegas ("UNLV"), a public university. *Tarkanian,* 488 U.S. at 185–86, 109 S.Ct. 454. Based on the NCAA's recommendation that Tarkanian be disciplined for violations of the NCAA's recruiting rules, UNLV suspended Tarkanian, in part to avoid further sanctions threatened by the NCAA if UNLV did not adopt its recommendation. *Id.* at 186–87, 109 S.Ct. 454.

Tarkanian sued the NCAA under section 1983. *Id.* at 187–88, 109 S.Ct. 454. The Supreme Court noted that the case presented a unique question, given that the private entity, the NCAA, did not "take[ ] the decisive step that caused the harm to the plaintiff." *Id.* at 192, 109 S.Ct. 454. Therefore, the question was not "whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id.* at 193, 109 S.Ct. 454. The Court held that they did not. *Id.* at 199, 109 S.Ct. 454. The Court relied on the fact that the NCAA could not "directly discipline Tarkanian or any other state university employee;" rather, the decision to adopt the recommendation of the NCAA was the university's. *Id.* at 197, 109 S.Ct. 454. The same distinction applies here. Kroger, Frizell, and Majlat are not alleged to have had any power to discipline HISD employees. Rather, the conduct of which Caleb complains is a mere recommendation to HISD that she be disciplined—a recommendation that HISD was free to accept or reject. As such, the Supreme Court's reasoning in *Tarkanian* leads to the conclusion that Kroger, Frizell, and Majlat were not state actors, at least as far as Caleb's claims are concerned.

**\*235** To be sure, there are facts in *Tarkanian* that are distinguishable from this case. In *Tarkanian,* the Court noted that, in the posture of the NCAA investigation, the NCAA and UNLV were antagonists, comparing the situation to that of public defenders, held not to be liable as state actors in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). *Id.* at 196, 109 S.Ct. 454 ("[T]he NCAA is properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an investigation of one public university."). In contrast, here HISD commissioned the internal investigation itself. Further, unlike in *Tarkanian,* HISD used its governmental powers to facilitate the investigation by having administrators summon Appellants to meetings with Kroger, Frizell, and Majlat. *See id.* at 197, 109 S.Ct. 454 ("[The NCAA] had no power to subpoena witnesses, to impose contempt sanctions, or to assert sovereign authority over any individual."). Yet other distinctions are countervailing. In *Tarkanian,* the NCAA was able to coerce the university, through sanctions and possible expulsion from the association, to adopt its recommendation. *Id.* at 198, 109 S.Ct. 454. Here, Kroger, Frizell, and Majlat had no authority over HISD, much less the ability to impose sanctions. On balance, we are not persuaded that these distinctions affect the fundamental consideration in *Tarkanian,* which was that the NCAA's recommendation was not the decisive step that caused the harm to the plaintiff—rather, UNLV retained decision-making authority to discipline its employee. *See id.* at 197–98, 109 S.Ct. 454.

We also note that, even where the private party's act did not itself deprive the plaintiff of his constitutional rights, a showing of "joint action" would likely be sufficient to find state action. *See id.* at 197 n. 17, 109 S.Ct. 454. The joint action test provides that a private person can be held liable as a state actor where "he is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). This test generally requires a showing of a conspiracy between the private party and the state official. *See id.; Dennis v. Sparks,* 449 U.S. 24, 28–29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Yet Appellants expressly waived any argument for state action based on a conspiracy between Kroger and HISD in their response to Kroger's Third Rule 12(b)(6) Motion to Dismiss before the district court when they conceded that their conspiracy argument "has been abandoned explicitly." An appellant who abandons an argument before the district court may not resurrect it on appeal. *MacArthur v. Univ. of Tex. Health Ctr. at Tyler,* 45 F.3d 890, 896 (5th Cir.1995) ("[W]e must dismiss this appeal ... on the basis that the one claim that [the plaintiff] raises—Title VII retaliation—was abandoned at the district court, thus is not embodied in the district court judgment, and consequently is not before this court on appeal.").

We also respectfully reject the district court's reasoning in finding state action—that Kroger, Frizell, and Majlat were "performing duties normally 13 carried out by HISD staff." The Supreme Court's "holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' " *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Rather, "the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the state.' " *Id.* (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. 449). Appellants cite no authority for the proposition that internal investigations of employee misconduct are traditionally the exclusive **\*236** prerogative of the state. Rather, they merely allege that, in practice, internal investigations are generally conducted by HISD itself. But the fact that a state elects to perform a public service itself does not make such a service "traditionally the exclusive prerogative of the state." *See Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764 (emphasis omitted). As such, we hold that Appellants have failed to plead sufficient facts to show that Kroger, Frizell, and Majlat

were state actors because they were performing functions traditionally exclusively reserved to the state.[4]

Given the foregoing, we conclude that the recommendation by Kroger, Frizell, and Majlat as to Caleb was not state action. As such, Caleb has failed to state a section 1983 claim against Kroger, Frizell, and Majlat.

[2] Cockerham, Banks, and Lenton have also failed to state a claim for First Amendment retaliation, because their speech was made pursuant to their official duties. In their complaint, Cockerham, Banks, and Lenton alleged that they exercised free speech when they refused to agree with purportedly false accusations made against Caleb in their interviews by Appellees.[5] But they also allege that they were ordered by HISD officials to take part in those interviews. Furthermore, the plaintiffs have pled facts that show that these meetings were directly related to their employment. The interviews concerned allegations of cheating on state standardized tests and misappropriation of school property. Accordingly, it is undisputed that the speech at issue here was made within the chain of command and that it was related to the employees' jobs, which are both factors that this court has previously considered in determining that speech was made as an employee and not as a citizen. *See, e.g., Davis v. McKinney,* 518 F.3d 304, 313 (5th Cir.2008) ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). Further, it seems obvious to state that assisting in an employer's investigation into workplace theft is ordinarily within the scope of an employee's job duties, equally so to state that it is ordinarily within the scope of a teacher's duties to ensure compliance with standardized testing procedures. That Cockerham, Banks, and Lenton were required to speak in the course of their assistance in the investigation did not "mean [their] supervisors were prohibited from evaluating [their] performance." *Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951; *see also id.* at 424, 126 S.Ct. 1951 ("[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."). As such, the speech that Cockerham, Banks, and Lenton have alleged as the basis for their employer's retaliation was made pursuant to their official duties. It is therefore outside the **\*237** ambit of First Amendment protection, and they have failed to state a claim on which relief may be granted.

## IV. Free Association Claims

[3] In order to state a claim for retaliation based on the First Amendment right to freedom of association, a plaintiff must show: "(1) he suffered an adverse employment action, (2) his interest in 'associating' outweighed the [employer's] interest in efficiency, and (3) his protected activity was a substantial or motivating factor in the adverse employment action." *Hitt v. Connell,* 301 F.3d 240, 246 (5th Cir.2002). The First Amendment protects two broad categories of association. *Roberts v. United States Jaycees,* 468 U.S. 609, 617, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The first protects "choices to enter into and maintain certain intimate human relationships." *Id.* Those intimate human relationships include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). The second category is association for the purposes of engaging in other activities protected by the First Amendment, such as speech or the free exercise of religion. *United States Jaycees,* 468 U.S. at 618, 104 S.Ct. 3244.

If Cockerham's, Banks's, and Lenton's claimed association is to be protected under the First Amendment, it must fall under the first category. The types of association properly characterized as "intimate human relationships" are limited to "relationships that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1051–52 (5th Cir.1996) (internal quotation marks omitted). These relationships "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *United States Jaycees,* 468 U.S. at 620, 104 S.Ct. 3244. The First Amendment "does not include a generalized right of social association." *Wallace,* 80 F.3d at 1051 (internal quotation marks omitted). For example, we have previously held that association in certain private clubs was protected under the freedom of association, but that a college basketball coach's relationship with his players was not. *See id.* at 1052. It therefore follows that "[r]elationships with colleagues ordinarily are not afforded protection as intimate associations." *Hernandez v. Duncanville Sch. Dist.,* No. 3:04 CV 2028 BH(B), 2005 WL 3293995, at \*10 (N.D.Tex. Dec. 5, 2005) (citing *Swanson*

v. City of Bruce, Miss., 105 Fed.Appx. 540, 542 (5th Cir.2004) (unpublished)); see also Martsolf v. Christie, 552 Fed.Appx. 149, 152 (3d Cir.2013) (unpublished); Colbert v. City of McKinney, No. 4:12cv612, 2013 WL 3368237, at *7 (E.D.Tex. July 3, 2013).

Here, Cockerham, Banks, and Lenton have not alleged sufficient facts to state a freedom of association claim. They have alleged that they "exercised protected association with Caleb, in that they constituted members of what Majlat [had] characterized ... as Caleb's 'clique.'" However, without more, this "association" appears to be nothing more than a group of close work colleagues. While the complaint does allege that "Cockerham and Lenton were members of a small group of individuals chosen by Caleb to ... move with her [to Kashmere]" and that Caleb was "highly selective of those with whom she chose to ... go with her to Kashmere," such selectivity is no different from any manager's *238 prudent hiring decisions. These allegations are consistent with a relationship amongst colleagues and fail to suggest an intimate relationship protected by the First Amendment.

[4] Caleb's claims against Kroger, Majlat, and Frizell also fail. Caleb's freedom of association claim derives from the second category of protected association—association for political purposes. She alleges that her right to political association was violated as the Appellees retaliated against her for associating with a state representative, Representative Dutton, at the town hall meeting on November 12, 2009 and with HISD Board Member Carol Mims Galloway. Aside from conclusory allegations, the only facts asserted in the complaint that could plausibly be understood to relate to Caleb's relationships with these individuals are that Majlat stated that Caleb had "friends in high places" and that, if anyone reported her to the HISD board, Caleb would find out about it immediately. Yet even assuming those statements referred to Dutton and Galloway, merely noting that Caleb had those relationships does not plausibly suggest that Majlat, much less Frizell and Kroger, took any action against Caleb based on that association. As such, Caleb has failed to state a claim against Kroger, Frizell, and Majlat based on her First Amendment rights to freedom of association.

V. Procedural Due Process Claims

[5] Appellants have also failed to state a claim for violations of their procedural due process rights. We first note that, assuming the allegations in the complaint are true, Appellants were entitled to procedural due process protections. "It is now beyond any doubt that discharge from public employment under circumstances that put the employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name." Rosenstein v. City of Dallas, Tex., 876 F.2d 392, 395 (5th Cir.1989), reh'g granted, 884 F.2d 174, reinstated 901 F.2d 61 (5th Cir.1990) (en banc). Government officials do not violate the Fourteenth Amendment by "publicly disclosing charges against discharged employees," provided that they afford procedural due process protections that allow the implicated employees to clear their names. Id. "[A] liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" Bledsoe v. City of Lake Horn, Miss., 449 F.3d 650, 653 (5th Cir.2006) (quoting White v. Thomas, 660 F.2d 680, 684 (5th Cir.1981)). "'[T]he process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee.'" Hughes v. City of Garland, 204 F.3d 223, 226 (5th Cir.2000) (quoting Rosenstein, 876 F.2d at 395).

In order to state a claim that their liberty interest to a name clearing hearing was infringed, Appellants must have alleged:

> (1) that [they were] discharged; (2) that stigmatizing charges were made against [them] in connection with the discharge; (3) that the charges were false; (4) that [they were] not provided notice or an opportunity to be heard prior to [their] discharge; (5) that the charges were made public; (6) that [they] requested a hearing to clear [their] name[s]; and (7) that the employer refused [their] request for a hearing.

Id. The district court did not err in dismissing the complaint for failure to state a *239 procedural due process claim, because the allegations in the complaint itself establish that Banks, Cockerham, and Lenton cannot meet the elements of the claim. To the contrary, Banks, Cockerham, and Lenton have alleged facts that show that they were given a hearing to address the charges associated with the investigation.

Cockerham has alleged that he was afforded an independent hearing and that the independent hearing officer refused to terminate him. Banks has pleaded that she received a two-day independent hearing where she had the opportunity to "proclaim[ ] the falsity of the charges against her." Furthermore, Lenton has alleged that he requested and

received a due-process hearing before an independent hearing officer. Cockerham's, Banks's, and Lenton's failure to allege that they asked for and were refused a hearing is dispositive. *See Bledsoe,* 449 F.3d at 653 (plaintiffs must plead that they requested and were denied a name-clearing hearing). It is immaterial whether the Plaintiffs were given an opportunity to clear their names before the Kroger report was released. *See Campos v. Guillot,* 743 F.2d 1123, 1126 (5th Cir.1984) ("It is not necessary that the hearing occur prior to publication of the stigmatizing charges." (quoting *Wells v. Hico Indep. Sch. Dist.,* 736 F.2d 243, 256–57 (5th Cir.1984))). As to Lenton's claim relating to the incident with White at his due process hearing, we do not address the issue as it was not adequately briefed. *See United States v. Scroggins,* 599 F.3d 433, 446 (5th Cir.2010) ( "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." (internal quotation marks omitted)). Lenton cites no legal authority for his argument that not allowing White to be called at his hearing violated his due process rights, and, as such, it is waived. *See* Fed. R.App. P. 28(a)(8)(A) (stating that the argument must contain "appellant's contentions and *the reasons for them,* with *citations to the authorities* and parts of the record on which the appellant relies" (emphasis added)); *Scroggins,* 599 F.3d at 447 ("In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and any relevant Fifth Circuit cases." (internal quotation marks omitted)).

[6] As to Caleb's claims, she has alleged no facts indicating that Kroger, Frizell, and Majlat had any ability, authority, or even influence to deny her access to a name-clearing hearing, much less that they did so. As such, she has failed to state a claim for violation of her procedural due process rights by Kroger, Frizell, and Majlat.

## VI. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**All Citations**

598 Fed.Appx. 227, 316 Ed. Law Rep. 29, 2015 IER Cases 174,060

Footnotes

| | |
|---|---|
| \* | Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4. |
| 1 | Since we are reviewing the district court's judgment granting a motion under Federal Rule of Civil Procedure 12(b)(6), we accept the allegations in the amended complaint as true. |
| 2 | The district court also dismissed all claims made by another plaintiff, Jackie Anderson; however, her claims are not a part of this appeal. |
| 3 | For this reason, we do not address Caleb's equal protection cause of action. |
| 4 | Tangentially related is Texas Education Code Section 44.031(f), which allows school districts to hire outside attorneys without going through the normal bidding process for awarding contracts. |
| 5 | That Appellants have alleged retaliation based on their refusal to speak does not affect the analysis. *See Riley v. Nat'l Fed'n of the Blind of N.C.,* 487 U.S. 781, 796–97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."). |

End of Document                © 2023 Thomson Reuters. No claim to original U.S. Government Works.