# EXHIBIT 3

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by [Karasek v. Regents of University of California,](#) N.D.Cal., April 14, 2021

2017 WL 4364406
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Jillian DOHERTY, Plaintiff,
v.
EMERSON COLLEGE et al., Defendants.

No. 1:14-cv-13281-LTS
|
Filed 09/29/2017

**Attorneys and Law Firms**

David P. Angueira, Kathryn J. Wickenheiser, Swartz & Swartz, Boston, MA, for Plaintiff.

Harold W. Potter, Jr., Paul G. Lannon, Jr., Katrina N. Chapman, Holland & Knight, LLP, Boston, MA, for Defendants.

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 101) AND MOTION TO STRIKE (DOC. NO. 116)

Leo T. Sorokin, United States District Judge

**\*1** Jillian Doherty sued Emerson College and Michael Arno, individually and as Emerson's Title IX investigator, asserting four claims: violation of Title IX against Emerson; and negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress against Emerson and Arno. Doc. No. 39. The claims arise from Emerson's response to a report by Doherty that she had been sexually assaulted on campus by another student. Defendants have moved for summary judgment on all counts, Doc. No. 101, Doherty has opposed, Doc. No. 111, and Defendants have replied, Doc. No. 115. The Court held a motion hearing on September 19, 2017. Doc. No. 123. For the reasons stated below, the Motion for Summary Judgment is ALLOWED. Defendants' Motion to Strike, Doc. No. 116, is DENIED AS MOOT.

### I. FACTS

The Court describes the undisputed facts established by the record evidence and draws all reasonable inferences in Doherty's favor. When material facts are in dispute, the Court accepts Doherty's facts.

#### A. Doherty's Report and Emerson's Initial Response

Doherty entered Emerson College as a freshman in the fall of 2011. Doc. No. 103-2 at 4. She attended Emerson's orientation and received a copy of the student handbook. Id. at 5. The student handbook included information on Emerson's sexual assault policies, including safety measures, reporting violations, and the student disciplinary process; it also contained Emerson's alcohol policy. Doc. No. 103-6 at 5-6.

Doherty completed her freshman year and went home for the summer. Doc. No. 103-2 at 14. She spent the fall semester of her sophomore year studying abroad as part of an Emerson program. Id. at 15. She returned to Emerson's campus for the spring semester. Id. at 15.

At 1:00 AM on March 2, 2013, Doherty sent an e-mail to Robert Ludman, Dean of Students; Lee Pelton, President of the College; and Sharon Duffy, Associate Dean of Students, the relevant portions of which follow:

To Whom It May Concern:

> It has come to my attention that Emerson College has not taken significant action to protect the students of the Emerson Community.... I, as a member of the Emerson Community, demand that you and the college take immediate action to protect the students of this community....

> Also, I, too, have been raped on campus. I didn't say anything because I was too afraid, but the fact still stands that the statistics on rape and sexual assault at Emerson College are grotesque and severe. Please help us stop this.

> Thank you for your time,

> Jillian Doherty

Doc. No. 103-10 at 2. Doherty's e-mail was the first report she made to Emerson about the sexual assault. Doc. No. 103-2 at 18. Ludman responded at 11:04 AM the same day, about ten hours after Doherty's e-mail, offering support and

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.321 Filed 08/02/23 Page 3 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

advising Doherty of Emerson's resources that were available to her, including the Counseling Center, Center for Health and Wellness, and Campus Police. Doc. No. 103-10 at 2. Additionally, Ludman forwarded Doherty's e-mail to several administrators, including Arno and Alexa Jackson, Associate Vice President of Human Resources and Title IX Coordinator. Id. Jackson responded within a few hours to set up a meeting among the administrators to discuss Emerson's response to Doherty's e-mail. Doc. No. 103-11 at 2.

**\*2** Michael Arno was designated by Emerson to investigate Doherty's report. On March 5, 2013, he e-mailed Doherty:

> Dear Jillian,
>
> I hope this email finds you well. My name is Mike Arno and I work in the conduct office. I am contacting you today because Dean Ludman informed me that you reported being sexually assaulted on campus. I'm so sorry to hear that you had to experience this awful event.
>
> Given the nature of the information you shared, I would like to invite you to meet with me. I would like to meet just to make sure you are doing ok and to make sure you are aware of the services at Emerson that can support you. It would be great if you could propose a time that is convenient for you to meet with me after you return from break. If you are around this week and would like to meet that would be great as well.
>
> It is important to me and the College that we touch base, even if you wish not to share any details of your experience.
>
> I look forward to hearing from you.
>
> Sincerely,
>
> Mike Arno

Doc. No. 103-12 at 2. Doherty responded the next day, stating: "Thank you for reaching out to me. It means a lot that the Emerson community and faculty are being so supportive and responsive." Id. She noted her availability, and Arno responded to schedule a meeting for the following week, on the first Monday after the school break. Id.

On March 11, 2013, Doherty and Arno met in Arno's office. Arno explained to Doherty that, while she was encouraged to share the name of the assailant,[1] she was not required to do so. Doc. No. 103-2 at 20. Doherty shared the assailant's name with Arno, but said she did not want to pursue criminal charges or school conduct charges against him. Id.; Doc. No. 103-13 at 2. Doherty stated she did not feel threatened by the assailant. Doc. No. 103-13 at 2. She noted he was on a semester abroad and asked that Emerson meet with him before he returned to campus. Id. Arno reminded Doherty of the resources available to her at Emerson. Doc. No. 103-2 at 20.

The same day, Arno sent Doherty an e-mail summarizing their meeting and asking her to confirm that the summary was accurate. Doc. No. 112 at 13. She responded with two clarifications—the spelling of a witness's name and an additional detail—and confirmed that the meeting notes were otherwise accurate. Id. at 13-14; Doc. No. 103-2 at 21. Arno confirmed with Doherty that she did not feel threatened by the assailant at that time and that she was comfortable with the assailant having guest access to her dorm. Doc. No. 103-2 at 21. He also informed her that Emerson would begin a Title IX investigation, id., and that a Stay Away Directive would be put in place between Doherty and the assailant, Doc. No. 112 at 15. Arno forwarded his meeting summary to Ludman and Jackson. Id.

### B. Emerson's Title IX Investigation

On March 26, 2013, Arno met with Doherty to update her on the status of the Title IX investigation. Doc. No. 103-2 at 22. He confirmed that Doherty was willing to cooperate in the investigation and explained Emerson's student conduct disciplinary process. Doc. No. 112 at 15. He verified that Doherty felt safe on campus at that point and that she believed she would feel safe when the assailant returned to campus. Id.

**\*3** The next day, Doherty sent Arno two Facebook conversations, the first from April 16, 2012, in which the assailant invited Doherty to his room,[2] and the second from April 26, 2012, in which Doherty confronted the assailant.[3] Doc. No. 103-7. Doherty told Arno that one of the assailant's roommates had seen her and the assailant after the incident, but that she could not remember the witness's name. Doc. No. 112 at 16. Arno e-mailed Doherty to set up a time to look at photographs of the assailant's roommates at the time to identify the witness; she subsequently reviewed the photos and identified the individual she recalled seeing. Id.; Doc. No. 103-2 at 23.

On April 12, 2013, Arno e-mailed Doherty to update her on the investigation and confirm that he would interview the

individual she had identified. Doc. No. 112 at 16. He notified her of the date on which he planned to inform the assailant of Doherty's report and the pending investigation, and said he would meet with the assailant when he returned to Boston the following week. Id.

Arno contacted the assailant on April 15, 2013, informing him that a report had been made about his conduct and asking to meet when he returned to Boston. Id. The assailant responded that he would be in Boston for only one day, on April 17, 2013. Id. On that date, Arno met with the assailant and gave him a copy of the Stay Away Directive, which prohibited the assailant from communicating with Doherty and barred him from entering Doherty's residence hall. Id. at 17. Arno also sent Doherty a Stay Away Directive. Id. The assailant left campus for the semester after meeting with Arno. Id.

**\*4** On April 19, 2013, Arno e-mailed Doherty to tell her he had met with the assailant, that they had a "positive" conversation, and that the assailant had left campus for the semester. Doc. No. 103-22 at 2. Arno wrote a summary of his investigation and shared it with Ludman and Jackson. Doc. No. 112 at 17. Arno questioned the veracity of Doherty's account of the events because Doherty's own witnesses, according to Arno, did not seem to support her account,[4] and, although the assailant did not deny the event, he claimed not to remember it. Doc. No. 103-24 at 2. Arno ultimately determined, after consulting Jackson, that a conduct hearing was warranted. Doc. No. 112 at 17-18.

### C. The First Conduct Board Hearing

On April 24, 2013, Arno e-mailed Doherty to inform her that Emerson had decided to move forward with a conduct board hearing. Id. at 18. He told her the hearing would be scheduled after finals, at the start of May. Id. The same day, Doherty called Arno and said she had incorrectly identified which one of the assailant's roommates had seen her and the assailant after the incident. Id. Doherty identified a different roommate as the witness, and Arno interviewed that person. Id.

The following day, Doherty contacted Arno to identify her friend as another witness, identified for purposes of the investigation as Witness 5. Id. at 19. Arno tried once to contact Witness 5 to request a meeting, but Witness 5 did not respond. Id. Doherty later asked Witness 5 to reply to Arno. Id.

On April 29, 2013, Arno sent Doherty a summary report of the meetings the two had about the incident and asked her to confirm the document was accurate. Id. at 19. Doherty sent no corrections. Id. The next day, Arno met with Doherty to discuss setting a hearing date. Id. He allowed her to choose between a Skype hearing over the summer or an in-person hearing in the fall. Id. Doherty said she preferred a Skype hearing. Id. Shortly after her finals, Doherty flew home to California. Id. at 20.

On May 2, 2013, Arno wrote to Doherty offering dates for the hearing. Id. On May 10, 2013, he sent her an e-mail confirming the planned date of May 17, 2013, and attaching information about the conduct board hearing. Id. The attachments notified Doherty that the hearing would proceed according to the Special Conduct Board Procedures for Sexual Misconduct and Sexual Harassment Complaints. Id. The attachments also explained Doherty could notify Emerson if she did not wish to participate in the hearing; Doherty informed Arno that she wanted to participate. Id. The three members of the Conduct Board were identified in the attachments, which informed Doherty she could object to the designated members. Id. Doherty raised no objections. Id.

Arno attached a copy of his Title IX investigation report to his May 2, 2013 e-mail, id. at 22, along with a letter from David Haden, the Associate Dean and Director of Housing and Residence Life, id. at 21. Haden's letter informed Doherty that she could have an advisor, including an attorney, work with her before the hearing and attend the hearing with her. Id. Doherty chose not to have an advisor present for the hearing. Id. Haden's letter also advised Doherty that she should provide the names of any additional witnesses she wished to present at the hearing. Id. Doherty provided no other names. Id. Haden encouraged Doherty to meet with him before the hearing if she had any questions. Id.

On May 13, 2013, Arno e-mailed Doherty to confirm that, during the hearing, Doherty would communicate with the assailant through the Board Chair, and to explain that Doherty could write down any questions she had for the assailant, and the Board Chair would read them aloud. Id. at 23. Arno confirmed that Doherty was comfortable with that procedure. Id.

**\*5** On May 15, Witness 5 contacted Arno to provide her witness account. Id. Arno interviewed Witness 5 and, on May 16, sent Doherty and the assailant an updated Title

Case 1:23-cv-00255-PLM-RSK    ECF No. 19-3,    PageID.323    Filed 08/02/23    Page 5 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

IX investigation report that included a summary of the new interview. Id.

The Conduct Board hearing was held on May 17, 2013. Id. at 24. Doherty participated by Skype from California. Id. She did not request any disability accommodations for the hearing. Id. at 25. The Board consisted of three members, David Griffin, Seth Grue, and Tikesha Morgan. Id. at 24. All three were Emerson Administrators who had participated in previous student conduct board hearings, including some involving allegations of sexual harassment or sexual discrimination. Id. at 24. Morgan was a trained Title IX investigator, id., although Doherty disputes whether her training was adequate, id. at 25. Griffin served as the chair. Id. at 26.

Before the hearing, the Board received a copy of Arno's investigation report, including an update after his interview with Witness 5. Id. Arno sent Griffin a script to follow at the hearing, based on Emerson's Special Conduct Board Procedures for Sexual Misconduct and Sexual Harassment Complaints. Id. at 26.

Doherty and the assailant signed confidentiality statements and presented facts supporting their positions. Id. During the hearing, the Board read a statement from a female student that included a personal reference for the assailant; Doherty interpreted the statement as a personal attack on her. Id. at 26-27. Arno summarized his investigation report during the hearing without providing his opinion on whether the assailant was responsible for a policy violation. Id. at 28. The hearing lasted approximately one hour. Id. Doherty and the assailant each were given the option to submit a final statement in writing after the hearing, or to deliver a final statement orally. Id. Doherty chose to make an oral statement. Id.

### D. The First Decision and Doherty's Appeal

After the hearing, the Board met to determine the outcome. Id. Morgan and Grue would vote with Griffin voting only if the other members could not reach a consensus. Id. Morgan and Grue—the two voting members—agreed the evidence was insufficient to find the assailant responsible for a policy violation. Id. Griffin agreed but did not vote. Id. at 28-29.

The practice at the time was for the Board to draft an explanation of the basis for their determination, and to submit the document to the Dean of Students. Id. at 29. The Dean of Students would review the rationale and identify anything requiring clarification. Id. The parties do not dispute that this process occurred: the Board drafted a rationale document that was submitted to Ludman, who reviewed it and asked for clarifications. Id. Doherty asserts that the process was "highly unusual" because the rationale was "written and rewritten six times before the final draft," and the drafting process involved Haden and Arno. Id. The Board's conclusion did not change during this process. Id. at 30.

Arno e-mailed Doherty on May 29 and June 5, 2013 to update her on the status of the deliberations and reiterate that she would be notified of the Board's decision as soon as it was issued. Id. In the June 5th e-mail, Arno stated: "I apologize that this process has taken so long." Doc. No. 103-43 at 3.

**\*6** On July 3, 2013, Emerson notified Doherty by letter that the Board had found the assailant "not responsible" for violating the student Code of Conduct. Doc. No. 112 at 30-31. The letter noted that one of the reasons the Board for the Board's determination was that Doherty's hearing testimony was inconsistent with an account she had provided to her roommate the day after the incident. Doc. No. 103-44 at 4; Doc. No. 112 at 31.

Arno contacted Doherty on July 10th to ensure that she had received the decision. Doc. No. 112 at 31. Emerson granted Doherty's request for additional time to appeal. Id. Doherty submitted her appeal on July 19, and Ludman confirmed its receipt on July 22. Id. In her appeal, Doherty stated that one of the assailant's suitemates—"Witness 4"—had additional information. Doc. No. 103-47 at 3. Specifically, Doherty alleged the assailant had changed his account of the incident to say he was awake when Doherty left; Doherty believed Witness 4 would confirm that the assailant had been asleep. Doc. No. 112 at 32. Arno had conducted a second interview with Witness 4 between the first hearing and the Board's decision. Id. at 33. On August 9, 2013, Ludman granted Doherty's appeal, based in part on the information from Witness 4 that had not been available before the first hearing. Doc. No. 103-49 at 3; Doc. No. 112 at 31-32. His decision meant that a new conduct board hearing would occur to permit consideration of the second interview of Witness 4 and any related testimony. Doc. No. 112 at 32.

In September 2013, Arno conducted an annual training for conduct board members. Id. at 33. The training covered how to handle reports of sexual assault. Id. All of the members

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.324 Filed 08/02/23 Page 6 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

selected for the second conduct board hearing had attended the Fall 2013 conduct board training. Id. at 33-34.

### E. The Second Conduct Board Hearing

On September 9, 2013, Emerson notified Doherty that the new Conduct Board hearing would be on October 9, 2013, and provided her with information on the procedures and Board members. Id. at 34. On September 17, Doherty provided Ludman with documents and names of witnesses she wanted to submit for the second hearing. Id. Ludman responded on September 20, specifying which evidence would be presented to the Board and why certain evidence was not permitted. Id. at 34-35. Ludman rescheduled the hearing for October 16th after Doherty became ill. Id. at 35. Before the hearing, Doherty and the assailant were permitted the opportunity to inspect the information that the Board would review. Id. On October 11, Ludman advised Doherty to come to his office before the hearing to minimize the chance that she would see the assailant on her way to the hearing. Id. at 35-36. Doherty did so. Id. at 36.

During the October 16, 2013 hearing, Doherty was assisted by an attorney acting as her advisor. Id. The hearing lasted about four hours and included live witness testimony. Id. Arno testified that, based on additional training he had received since the first hearing, he now believed the "scales were tipped in Doherty's favor." Id. Doherty disputes whether Arno had sufficient training, but she does not remember Arno telling her his training at the time of the first hearing was inadequate. Id. at 36-37.

After the second hearing, the Board found the assailant responsible for sexually assaulting Doherty, and Emerson expelled him. Id. at 37. Doherty received written notice of the Board's decision on October 22, 2013. Id. The letter explained the Board's reasoning and the sanctions against the assailant: the assailant was immediately expelled and was prohibited from entering or attempting to enter any Emerson building or residence hall and from attending any Emerson-sponsored activity or event. Id. Doherty was instructed to notify the Emerson police if the assailant failed to comply with any of the restrictions. Id. She never did so. Id.

*7 The assailant appealed the determination of the second Conduct Board. Id. Ludman provided Doherty with a copy of the appeal, informed her of the date by which Emerson would resolve it, and offered to meet with her to discuss it. Id. On November 14, 2013, Ludman notified Doherty that he had denied the appeal. Id. at 38.

### F. Relevant Post-Hearing Events [5]

The assailant did not sexually assault or threaten Doherty after the April 2012 incident. Id. Doherty and the assailant had no in-person conversations after the April 2012 incident. Id. They neither had nor attempted to have contact with one another after the imposition of the Stay Away Directive in April 2013. Id. at 39. They had classes in the same building twice a week in the fall of 2013, and Doherty saw the assailant "regularly." Id. at 38. At some point after the second hearing, Doherty saw the assailant and he glared at her, an encounter she found "very frightening" to the point of requiring the assistance of a friend. Id. at 38-39. Doherty did not report these interactions to Emerson. Id.

After the assailant's expulsion, Doherty did not see him on campus. Id. at 39. Doherty suspects he hacked into her Gmail account and leaked a copy of her Department of Education complaint in June 2014. Id. Doherty further suspects he may have attended hockey games or had other interactions with the Emerson hockey team after his expulsion. Id. at 40. She did not report her suspicions to Emerson because she says Emerson did not instruct her on what to do if other students saw the assailant on campus, only if she saw him herself. Id. at 37, 40.

Doherty sought accommodations from Emerson throughout her time there. The Court need not recount each and every request and response related to Doherty's accommodations; it suffices for present purposes to note there was a lengthy back-and-forth between Doherty and her family and the school, and that Emerson offered Doherty some, but not all, of the accommodations she sought. See id. at 40-44.

Doherty withdrew from Emerson in the spring of 2014. Id. at 44.

### II. DISCUSSION

The Court applies the familiar summary judgment standard to the defendants' motion. Fed. R. Civ. P. 56(a). Because no genuine dispute exists as to the facts material to any of Doherty's four claims, the defendants are entitled to judgment as a matter of law. Id.

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.325 Filed 08/02/23 Page 7 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

A. Title IX

It is well-established that Title IX protects against discrimination on the basis of sex, and that sexual assault is a form of sex discrimination. To demonstrate liability under Title IX, Doherty must show: (1) that she "was a student, who was (2) subject to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002). Only the fifth element is contested here. "To satisfy the fifth part of this formulation, the plaintiff[ ] must prove that a school official authorized to take corrective action had actual knowledge of the harassment, yet exhibited deliberate indifference to it." Id. Deliberate indifference in the case of student-on-student harassment requires that the school's "response (or lack thereof) is clearly unreasonable in light of the known circumstances." Porto v. Tewksbury, 488 F.3d 67, 73 (1st Cir. 2007).

**\*8** It is not enough for a plaintiff to show "that the school system could or should have done more." Id. In the educational setting, a plaintiff must establish that the school had notice of the harassment and "either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." Id. at 74. "[T]he fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [a defendant] at the time." Id. Title IX "does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by [complainants]." Fitzgerald v. Barstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007), rev'd on other grounds, 555 U.S 236 (2009).

It bears noting at the outset that Doherty has not suggested Emerson had reason to know—before she reported her assault and disclosed the assailant's name—that the assailant, in particular, posed a danger to Doherty or anyone else. Instead, she advances several more general arguments she asserts establish Emerson's liability under Title IX.

First, Doherty contends that "Emerson had an obligation to educate its students about the issues of consent, sexual assault, the high correlation between alcohol and sexual assault[,] and their Title IX rights." Doc. No. 111 at 15. She urges that the alcohol-and sexual-assault-related education and training Emerson provided to its students were so inadequate as to demonstrate a deliberate indifference to her sexual assault. [6] However, Doherty has not supplied evidence that would justify such a conclusion here. The undisputed evidence establishes that Emerson provided all students with information about sexual assault risks, alcohol risks, and resources available related to such risks. Doc. No. 103-2 at 5; Doc. No. 103-6 at 5-6. That these resources did not specifically link the associated risks of alcohol use and sexual assault to one other is insufficient to support a finding of deliberate indifference, at least where Emerson educated students on these topics, and there is no evidence suggesting Emerson knowingly ignored alleged deficiencies in this regard. [7] Doherty's assertions amount to an argument that Emerson was generally aware of the problem of sexual assault and alcohol use on campuses nationwide, and that it could have done more to educate its students on those topics. Even if Doherty's assertion is correct, it is legally insufficient to establish deliberate indifference. [8] See Thomas v. Bd. of Trs. of the Neb. State Colls., No. 15-2972, 2016 WL 3564252, at \*1-2 (8th Cir. July 1, 2016) (holding that a college's knowledge of a dropped rape charge and accusations of sexual harassment against a student were insufficient to establish that the college had actual knowledge of a risk of harm); cf. Shank v. Carleton Coll., 232 F. Supp. 3d 1100, 1109 (D. Minn. 2017). ("Tolerating students' misuse of alcohol—even with knowledge that such misuse increases the risk of harmful behaviors such as sexual assault—is simply not the same thing as actual knowledge of sexual assault.").

**\*9** Second, Doherty asserts that Emerson's response to her rape was so inadequate, and demonstrated such bias against her, that it constituted deliberate indifference. Doc. No. 111 at 16-17. The record not only fails to support this contention, it proves otherwise. The evidence before the Court establishes that Emerson promptly and seriously responded to Doherty's report, commenced an investigation, issued a stay-away order, offered Doherty counseling, and, ultimately, expelled the assailant. Doherty correctly points out that Arno, at the time of the first hearing, questioned her account. However, an investigator's honest and open-minded evaluation of the evidence gathered in the course of a Title IX investigation is not evidence of either bias or deliberate indifference. Arno's skepticism of Doherty's claim after his first round of investigation does not establish deliberate indifference by Emerson where the undisputed facts establish that he undertook a prompt and generally complete investigation, articulated non-frivolous reasons for his conclusion, and

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.326 Filed 08/02/23 Page 8 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

did not render the ultimate decision on behalf of Emerson. To the extent Doherty suggests Arno failed to follow up with one witness, and that such failure establishes deliberate indifference, there is no evidence supporting such a finding. Rather, the record shows Arno contacted every witness Doherty identified. Although Witness 5 failed to respond to Arno's interview request, she eventually contacted him in time to be interviewed before the first Conduct Board hearing. Arno included a summary of that interview in his final report to the Board. Under these circumstances, Doherty's second theory provides no basis for finding deliberate indifference. See Wyler v. Conn. State Univ. Sys., 100 F. Supp. 3d 182, 194 (D. Conn. 2015) (finding a "careless" investigation is insufficient to establish deliberate indifference).

Third, Doherty argues the investigation and adjudication of her complaint establish deliberate indifference. Doc. No. 111 at 17-19. To survive summary judgment, Doherty must show that Emerson's response to her report was "clearly unreasonable." Porto, 488 F.3d at 73. Emerson's reaction was anything but unreasonable. Emerson first learned of Doherty's rape on March 2, 2013. Within a day, she had received a response advising her of the resources available to her, and school administrators met to discuss an appropriate response. Within two days, a Title IX investigator reached out to her. Even while Doherty was maintaining that she did not want the assailant to get into trouble, Emerson was working to find out who he was and formulate an appropriate response. Emerson issued Stay Away Directives and banned the assailant from Doherty's dorm. Doherty received a Skype hearing, as requested, was later granted an appeal, and then had a second, in-person hearing. That Doherty did not receive the result she wanted after the initial hearing does not establish deliberate indifference by Emerson.

Fourth, Doherty asserts Emerson was deliberately indifferent in its dealings with her after she reported the assault. Doc. No. 111 at 20-21. This section of Doherty's Opposition is notably devoid of case law or developed argument supporting her position. Emerson expelled the assailant, banned him from Emerson's buildings and events, and instructed Doherty on how to contact Emerson police if she saw him. [9] Doherty has not advanced sufficient evidence to permit a jury to find deliberate indifference on this theory.

Finally, Doherty alleges Emerson offered her inadequate accommodations on her coursework, ultimately leading to her withdrawal from the college. Doc. No. 111 at 21-22. Emerson was not deliberately indifferent in discussing accommodations with Doherty. Doherty's own account of the accommodations she was given reveal that Emerson considered her requests, and that she was offered accommodations, just not every accommodation she wanted. Id. at 21. The extensive back-and-forth between Emerson and Doherty belies an assertion of deliberate indifference.

The sum of these parts leads to no different result under the deliberate indifference standard. Even considering all of the individual alleged shortcomings Doherty highlights, the evidence fails to provide a basis upon which a reasonable jury could conclude that Emerson was deliberately indifferent here. Accordingly, the Motion for Summary Judgment is ALLOWED as to Count I.

B. Negligence

**\*10** Doherty next asserts Emerson was negligent "in failing to provide a safe environment for its students, including the plaintiff, and violating its duty to comply with Title IX." Doc. No. 111 at 22. Doherty's negligence claim is based not on a risk specific to the assailant, nor on an argument that Emerson must attempt to eradicate drinking on campus to properly discharge its duties. [10] Id. Rather, her claim is that "Emerson failed to properly educate students, including her, to identify rape under circumstances like Doherty's assault, about the increased risk of sexual assault due to drinking, or about their Title IX rights." Id.

To establish negligence under Massachusetts law, a plaintiff must show (1) that the defendant owed her a legal duty, (2) that the defendant breached that duty, and (3) that the breach is the proximate cause of the her injuries. Davis v. Westwood Grp., 652 N.E.2d 567, 569 (Mass. 1995). In Massachusetts, colleges have a duty "to protect their resident students against the criminal acts of third parties." Mullins v. Pine Manor Coll., 449 N.E.2d 331, 336 (Mass. 1983). This duty requires colleges "to use reasonable care to prevent injury ... by third persons." Id. The duty extends only to acts by third parties that are "reasonably foreseeable" to the college. Kavanagh v. Trs. of Bos. Univ., 795 N.E.2d 1170, 1178 (Mass. 2003). Massachusetts law, however, "does not impose a legal duty on colleges or administrators to supervise the social activities of adult students, even though the college may have its own policies prohibiting alcohol or drug abuse." Doe v. Emerson Coll., 153 F. Supp. 3d 506, 514 (D. Mass. 2015) (citing Bash v. Clark Univ., No. 06745A, 2006 WL 4114297, at \*5 (Mass. Super. Ct. Nov. 6, 2006)). Doherty has not established

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.327 Filed 08/02/23 Page 9 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

the existence of the specific duty she seeks to impose, nor provided sufficient evidence to permit a jury to find in her favor on any of the elements of her negligence claim.

Insofar as Doherty's negligence claims relate to Title IX, they fail for a further reason. Doherty claims Emerson negligently implemented Title IX, in informing its students about the law and through its investigation and adjudication of her complaint. However, neither Title IX specifically, nor federal law generally, give rise to a cause of action for negligent implementation of Title IX. Federal law limits damage liability claims to deliberate indifference. See Frazier, 276 F. 3d at 66. Doherty has cited no Massachusetts law establishing a state common-law duty to implement Title IX in a non-negligent manner. Indeed, a negligence claim framed in this manner, with the duty itself arising from a federal law, likely would raise federal preemption concerns. [11] Accordingly, the Motion for Summary Judgment is ALLOWED as to Count II.

### C. Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress under Massachusetts law, a plaintiff must establish: (1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symptomatology, and (5) that a reasonable person would have suffered emotional distress under the same circumstances. Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982). As described above, Doherty has not produced evidence from which a jury could find that Emerson was negligent. Thus, she cannot establish the first element of negligent infliction of emotional distress. See Urman v. S. Bos. Sav. Bank, 674 N.E.2d 1078, 1083 (Mass. 1997). The Motion for Summary Judgment is ALLOWED as to Count III.

### D. Intentional Infliction of Emotional Distress

*11 To state a claim for intentional infliction of emotional distress ("IIED") under Massachusetts law, a plaintiff must establish: (1) that the defendant intended to inflict emotional distress or knew that emotional distress was likely to result, (2) that the defendant's conduct was extreme and outrageous, (3) that the actions of the defendant were the cause of the plaintiff's emotional distress, and (4) that "the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997). Conduct is "extreme and outrageous" if it is "beyond all possible bounds of decency and utterly intolerable in a civilized community." Id. This is a high bar. "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (quotation marks omitted); accord Tetrault, 681 N.E.2d at 1197.

Doherty has not identified extreme or outrageous behavior by Emerson that was targeted at her. She points to no case law suggesting Emerson's actions here—in the materials it distributed, its response to her complaint, its handling of the investigation and adjudication of her case, or the accommodations it offered her thereafter—exceeded the bounds of decency or are intolerable in a civilized community. [12] See Doe, 153 F. Supp. 3d at 518 (dismissing a case where "the complaint's allegations largely rest on Doe's dissatisfaction with Emerson's policies and procedures, what she perceived to be their inadequate sensitivity to her issues, and the results of the various investigations"); Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 247 (D. Vt. 1994) ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim."). The Motion for Summary Judgment is, therefore, ALLOWED at to Count IV.

### III. CONCLUSION

Defendants' Motion for Summary Judgment, Doc. No. 101, is ALLOWED. Defendants have filed a Motion to Strike Exhibits 73 and 78, Doc. No. 116. The Court concludes that, even considering these exhibits, summary judgment in Defendants' favor is warranted. Thus, the Motion to Strike is DENIED AS MOOT.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4364406

Case 1:23-cv-00255-PLM-RSK   ECF No. 19-3, PageID.328   Filed 08/02/23   Page 10 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

## Footnotes

1   The Court refers to the other Emerson student as "the assailant," instead of by name, given the nature of the allegations, that the assailant is not a party to this litigation, and the practice of other courts in similar situations. E.g., Theriault v. Univ. of S. Me., 353 F. Supp. 2d 1, 5 (D. Me. 2004).

2   The text of the April 16, 2012 conversation was:

    Assailant: Youuuu

    Doherty: meeee?

    Assailant: Come have sex with me

    Doherty: you're in new york

    Assailant: No I'm in my room

    Doherty: you said you were in new york

    Assailant: Ya I too a buss home

    Doherty: are you drunk? Hahaha

    Assailant: So drunk come over

    Doherty: hahahaha

      are you sure?

    Assailant: Yes

    Doherty: what room are you again?

    Assailant: 1304 prow

    Doherty: ok be there soon

Doc. No. 103-7 at 3-4 (all misspellings and other errors in original).

3   The text of the April 26, 2012 conversation was:

    Doherty: I really need to talk toy ou

    to you*

    Assailant: whats up

    Doherty: do you remember what happened that night that i came over last?

    Assailant: Vaguely

    Doherty: [Assailant], by definition you raped me

    Assailant: what?

Doherty: im not gonna do anything about it

but

do you not remember?

Assailant: i remember us having sex ...

Doherty: after the sex

Assailant: not really no

Doherty: well, by definition, you anally raped me ... [Assailant]?

Assailant: What

Doherty: did you get my last im?

Assailant: yes

i dont know what to say to that

Doherty: im not gonna do anything

i just wasnt sure if you remembered

remembered*

do you remember that part at all?

Assailant: no

i just

that's not me

you know thats not me

Doherty: it was because you were drunk

i know, that's why im not gonna do anything about it

i just wanted to let you know so that you dont drink that much again

Assailant: im so sorry

Doherty: its ok

Assailant: no it's definitely not

Doherty: well like

what do you want me to say?

Assailant: i don't know

Case 1:23-cv-00255-PLM-RSK   ECF No. 19-3,   PageID.330   Filed 08/02/23   Page 12 of 13

Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)
2017 WL 4364406

what do you want ME to say

Doherty: you said you were sorry

i've been sexually assaulted before in the past

and he didnt say he was sorry

so sorry means a lot to me

Assailant: ok

i dont want to make excuses

but you know that's not the kind of person i am

Doherty: no, i know

Assailant: i combined drinking with a lot of anger and sadness and i guess thats what

i got

Doherty: yeah

just promise me you'll try and keep your drinking at a safer level not just for my sake, but for yours you know?

Assailant: yeah i know

Doherty: you dont have to worry about me hating you or anything

because i dont

i know that the guy that did that wasnt you

it was really just a lot of alcohol and other shit

Assailant: it's been a long few weeks

and thats not an excuse

i just want you to know

Doherty: no, i understand

it has been for me, too

i didnt mean to upset you ...

but i just needed to say something

Assailant: ok

Doc. No. 103-7 at 4-8 (all misspellings and other errors in original).

Case 1:23-cv-00255-PLM-RSK ECF No. 19-3, PageID.331 Filed 08/02/23 Page 13 of 13

**Doherty v. Emerson College, Not Reported in Fed. Supp. (2017)**
2017 WL 4364406

| | |
|---|---|
| 4 | Arno noted that one of Doherty's witnesses knew of the incident but did not know Doherty said she had not consented, and another witness was not aware of the incident. Doc. No. 103-24 at 2. |
| 5 | Doherty and Emerson disagree over the characterization of her interactions with the assailant, but the basic facts are not in dispute and, where they are, the Court accepts Doherty's facts. |
| 6 | The Court agrees with Defendants that a rescuer theory of liability does not apply in light of Emerson's statutory obligation. See Mullins v. Pine Manor, 449 N.E.2d 331, 336 (Mass. 1983). |
| 7 | Additionally, Doherty affirmed at her deposition that she knew in April 2012 that she could have reported her rape to Emerson. See Doc. No. 103-2 at 14 ("Q. At that time in April 2012, did you have an understanding that you could have reported it to Emerson College? A. Yes."). This fact undermines Doherty's assertion that the information Emerson provided its students did not adequately inform her of her rights pursuant to Title IX. |
| 8 | As Doherty concedes, Emerson was not "obligated to eradicate sexual assault or alcohol use from campus," Doc. No. 111 at 15, and the question here is not whether Emerson offered the best possible education on these matters, Fitzgerald, 504 F.3d at 174. |
| 9 | To the extent Doherty is arguing that the instruction to contact the Emerson police was inadequate to the point of deliberate indifference because she was not told that she could contact the Emerson Police if she heard from others that the assailant was on campus (rather than if she saw him there herself), her argument fails. The letter following the second Conduct Board hearing stated that Doherty should "please let the College's Chief of Police or Dean of Students know immediately if the Respondent fails to comply with these terms so that we can take prompt and immediate action." Doc. No. 103-58 at 4. Nothing in that instruction limited what Doherty could report to her own sightings of the assailant on campus. |
| 10 | The Court does not understand Doherty to be asserting that Emerson's security procedures were inadequate, such that Emerson negligently caused her rape. |
| 11 | Doherty has not advanced a developed argument under Massachusetts law supporting an extension of recognized Massachusetts common-law duties to create any of the particularized duties she advances. |
| 12 | To be clear, what the assailant did to Doherty was "extreme and outrageous"; it was "beyond all possible bounds of decency and utterly intolerable in a civilized community." In dismissing Doherty's claims against Emerson and Arno, the Court is neither questioning nor minimizing the assault Doherty suffered in April 2012. |

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.